COPPER PROCESS CO. v. CHICAGO BONDING & INS. CO.

(Circuit Court of Appeals, Third Circuit. January 5, 1920.)

Nos. 2490-2494.

1. TRIAL &wkey;59(1)—ORDER OF PROOF IN SHOWING FRAUD NOT ERROR.

Where a surety on the bond of a seller asserted that plaintiff buyer was party to the seller's fraud in procuring the bond, proof of the seller's fraud followed by proof of the buyer's connivances cannot be objected to on the ground of the order of proof.

2. FRAUD &wkey;52—LATITUDE IN PROVING FRAUD IS ALLOWED.

When fraud is alleged great latitude of proof is allowed, and accordingly it is proper to show party's participation in fraud by showing what was said and done, leading up to the transaction.

3. FRAUD &wkey;16—SUPPRESSION OF TRUTH MAY BE.

Fraud may be committed by the suppression of truth as well as the suggestion of falsehood, but the law distinguishes between passive con-

cealment and active concealment, in that in active concealment there is implied a purpose of design.

4. FRAUD ⊜⟳17—SUPPRESSION OF TRUTH TO BE FRAUD MUST CONSIST OF MORE THAN SILENCE.

As a general rule, to constitute fraud by concealment or suppression of truth, there must be something more than silence; that is, there must be some occasion which imposes on one person the legal duty to speak in order that he may be placed on an equal footing, in which case failure to state a material fact is equivalent to a concealment, and amounts to fraud equally with an affirmative falsehood.

5. PRINCIPAL AND SURETY ⊜⟳57—EVASION AMOUNTING TO FRAUD IN PROCURING BOND.

Where a bonding company, before becoming surety on a bond contingent for an iron company's faithful performance of a contract of sale, asked the officer of plaintiff if it had made any advances on the contract, etc., and plaintiff's officer gave an evasive answer, which, while true as far as it went, did not disclose that plaintiff had made advances to the iron company under a special contract, such evasion amounted to fraud.

6. PRINCIPAL AND SURETY ⊜⟳160—EVIDENCE OF AGREEMENT WITH PLAINTIFF FOR ADVANCES TO SELLER ADMISSIBLE WHERE SELLER'S SURETIES ASSERTED CONCEALMENT WAS FRAUD.

After plaintiff contracted with an iron company for the purchase of large quantities of iron at a price little, if any, above cost, the parties entered into an agreement whereby plaintiff advanced to the iron company a large sum of money under a vague contract, but which, among other things, required the iron company to give bonds for faithful performance, *held* that, where plaintiff's officer, on being interrogated by the surety's representative, denied having made any advances under the contract to the iron company, the agreement was in any event admissible in evidence to show plaintiff's fraud.

7. EVIDENCE ⊜⟳104—EVIDENCE OF SUBSEQUENT RELATIONS BETWEEN PARTIES ACCUSED OF FRAUD.

Where the surety on the bond of a seller asserted that the seller was guilty of fraud in procuring the same, and that the buyer connived, evidence of subsequent acts of the buyer and of the seller is admissible to show the relationship between the parties at the time the fraud was committed.

8. APPEAL AND ERROR ⊜⟳1047(1)—RULING ON EVIDENCE NOT TO BE DISTURBED UNLESS HARMFUL.

While erroneous rulings in jury trials are presumptively injurious, the tendency is to enlarge the sphere of the trial judge in the admission and exclusion of testimony, and not to disturb the judgment, where it affirmatively appears that his rulings, if erroneous, were harmless.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Five actions by the Copper Process Company against the Chicago Bonding & Insurance Company, which were consolidated and tried as one. There was a judgment for defendant, and plaintiff brings error. Affirmed.

Francis Shunk Brown and William Findlay Brown, both of Philadelphia, Pa., for plaintiff in error.

Layton M. Schoch and Harry S. Ambler, Jr., both of Philadelphia, Pa., for defendant in error.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and MORRIS, District Judge.

WOOLLEY, Circuit Judge. These writs-of-error bring here for review five judgments of the District Court entered on verdict in a proceeding wherein five actions were consolidated and tried as one. The Copper Process Company was plaintiff; the Chicago Bonding and Insurance Company was defendant. The actions were on bonds of the defendant company, each for $52,400, given the plaintiff company to assure performance by the Bird Coal and Iron Company of its undertakings in the same number of contracts between it and the Copper Company for the sale and delivery of pig iron. The Iron Company defaulted on all five contracts. The Copper Company sued the Bonding Company on all its corresponding bonds; verdicts were rendered and judgments entered for the Bonding Company; whereupon the Copper Company sued out these writs-of-error.

The record is a large one; the specifications of error are fifty-nine in number. Of these, twelve are directed to the judge's charge; the remaining forty-seven concern rulings on the admission and exclusion of testimony. Whether any particular ruling or instruction involved error, and if so, whether such error was prejudicial or harmless, it is impossible to determine by considering each ruling or instruction separately and alone. It is only possible after reading the whole record in order to ascertain the real issues and to find the theory on which the trial judge tried them. Experience shows that when a trial judge is wrong in his conception of the issues, or of the principles of law applicable to them, his errors are likely to be many and also to be prejudicial; but if, on the other hand, the trial judge has properly grasped the issues and has tried them under applicable law, his errors are likely to be few and harmless.

On this theory of review, we shall follow the case in outline as pleaded and tried.

The Copper Company's statements of claim filed in the five actions are identical, except as the contracts for whose performance the several bonds were given called for pig iron deliveries in different months of the year 1917, beginning with the month of June and ending with the month of October. In each statement of claim it appears that the Copper Company declared on the indemnity bond of the Iron Company, as principal, and the Bonding Company, as surety, for $52,400, alleging, first, the execution of the bond, and, second, its breach by the Iron Company, making the bond by reference a part of the pleading. The bond assures the performance of the contract in customary terms, and, by reference, embodies the contract. The contract provides for the purchase by the Copper Company and sale by the Iron Company of 4,000 tons of Talladega pig iron of a given analysis during a given month at the price of $13.10 per ton delivered f. o. b. Talladega, Alabama, payments to be made on a given date.

The contracts bear date March 13, 1917; the bonds April 3, 1917.

Turning to the record, it appears that at the trial the Copper Company, to support the averments of its pleadings, formally and briefly proved the execution of the bonds, the breach of the contracts by the

Iron Company, and the resultant damages, and rested on the liability of the Bonding Company for indemnity.

The Copper Company has assigned but one error in the trial of its case in chief. This relates to a ruling of the trial judge in allowing the Bonding Company to lay grounds for contradiction. We dispose of this assignment here as involving no error.

So far, there was nothing in the case out of the ordinary. The trouble began with the Bonding Company's defence, and its defence began with its pleadings.

The defence of the Bonding Company, as pleaded, was, in the main, twofold:

First. That the contracts appended to the bonds when sued on were not the contracts appended to and covered by the bonds when issued; and that, in consequence, the contracts of indemnity sued on are not the contracts of indemnity which it executed and delivered.

Second. That it was induced to enter into the bonds by fraud of the Iron Company with the knowledge and connivance of the Copper Company.

These defences, as pleaded, were, in a word, non est factum and fraud.

To sustain the first defence, the Bonding Company introduced evidence tending to show that the bonds of indemnity into which it entered with the Copper Company did not cover contracts between the Copper Company and the Iron Company for the purchase and sale, monthly, of 4,000 tons of pig iron at $13.10 a ton as declared by the Copper Company in its pleadings, but covered, on the contrary, other contracts purported to have been entered into by the Copper Company and Iron Company, for the purchase and sale, monthly, of 2,000 tons of pig iron at $26.20 a ton; that copies of the supposed contracts between the two companies containing the items last given were certified to the Bonding Company by the Iron Company and were appended to the bonds when they were executed and delivered to the Copper Company; that between the time of their delivery and the bringing of these suits, the copies of the contracts so appended were removed from the bonds and copies of the real contracts substituted for them, during all of which time the bonds and accompanying copies of contracts were in the possession and control of the Copper Company. By this evidence, the Bonding Company offered to support its charge that there was a substitution of contracts and that the substitution was the act of the Copper Company. This evidence was, of course, controverted. On this issue of substitution there was ample evidence, properly admitted under the pleadings, for a finding by the jury in favor of the Bonding Company. As the jury's verdict for the Bonding Company was based either on this issue of substituted contracts or on the next issue of fraud, the Copper Company is concluded by the verdict on this issue.

[1] That the Bonding Company was induced to enter into its indemnifying undertakings by fraud and gross misrepresentations of the Iron Company is not seriously disputed by the Copper Company. Its position is that it was not a party to the fraud and was ignorant

of the misrepresentations. In its case in chief, the Bonding Company, in order to sustain its defence of fraud by the Iron Company and connivance by the Copper Company, first introduced testimony of the Iron Company's fraud and misrepresentations, to which many of the Copper Company's exceptions were noted and errors assigned, and then introduced testimony to show the relation of the Copper Company to the Iron Company by the acts of their officers and to show also the part which the Copper Company, through its officers, took in conniving at the fraud of the Iron Company. Obviously, no exception can be taken to this order of establishing connivance by one party in the fraud of another.

The substance of this testimony was that the Copper Company was not at any time concerned in any business other than its transactions with the Iron Company; and that the Iron Company had as its one asset an interest in an option or arrangement with Ladenburg, Thalman & Company of New York, for the operation of a blast furnace at Talladega, Alabama, which had long been out of use. When the Iron Company was practically without funds or tangible assets, it entered into the five contracts with the Copper Company on March 13, 1917, whereby it undertook to sell and deliver to the Copper Company, monthly, for a period of five months, 4,000 tons of pig iron at $13.10 a ton; a price in the Birmingham district, little, if any, above cost of production. With these contracts made, the two companies entered into another contract referred to at the trial as the "Underlying Agreement" or the "Y" agreement, reciting the five contracts just mentioned and providing, in consideration thereof, for an advance or payment by the Copper Company to the Iron Company of the sum of $50,000, and a further sum of $25,000, both sums to be placed to the credit of the Iron Company in the Commercial Trust Company at Philadelphia; the latter sum, however, to be drawn on by the Iron Company by voucher checks showing that the money was to be paid for certain purposes specified in the agreement, the one pertinent to this case being "Premium on surety bond, believed to be $2,700." This agreement further provided that if the Iron Company should be prevented by fire, strikes, riot, mob, or earthquake from making deliveries on the 20,000 tons of pig iron covered by the five contracts referred to, then the Iron Company would sell and deliver to the Copper Company its full production of pig iron of whatever grade and quality, at a price of $7.50 per ton below the market price. The curious feature of this agreement is, that nowhere in it is there provision for repayment or return to the Copper Company of the moneys it agreed to advance to the Iron Company. This agreement was signed some time in March, 1917, and, in part performance, the Copper Company placed $75,000 in bank to the credit of the Iron Company.

With these contracts made and outstanding, the Iron Company, in carrying out its undertaking to give the Copper Company bonds assuring the performance of its sales contracts, applied to the Bonding Company for five bonds of $52,400 each. To induce the Bonding Company to enter into these bonds, an officer of the Iron Company

supplied the Bonding Company with certified copies of what purported to be its pig iron contracts with the Copper Company, which showed that the sale and delivery covered, not 4,000 tons a month at the suspiciously low price of $13.10 a ton, as actually called for by the contracts, but 2,000 tons a month at what was then about the market price of $26.20 a ton. On this representation, Evans, an agent of the Bonding Company, went to Philadelphia and met one Wilson, an insurance broker, through whom the Iron Company was negotiating for bonds. Evans was shown what purported to be an engineer's report of the property, and an inventory and a financial statement of the Iron Company. He was informed that the Iron Company had $75,000 to its credit in the Commercial Trust Company (verified by letter from the depository) which was represented as money arising from the sale of stock; owned 2,511.5 acres of ore land; and possessed total assets of $1,360,650. In addition to statements previously made by the Iron Company in its application for bonds and by Wilson, the insurance broker, that no advance of any character had been made the Iron Company by the Copper Company under the contracts, an officer of the Bonding Company asked the Secretary of the Copper Company, prior to the delivery of the bonds, whether his Company had made any advance payments against iron deliveries under these contracts, to which the Secretary replied, "Absolutely not."

To aid the Iron Company in carrying out its undertaking in the "Y" agreement to obtain indemnity bonds for the protection of the Copper Company on the sales contracts, for which the Copper Company had provided $2,700, the President and Secretary of the Copper Company went to the bank with Wilson, who had received from the Iron Company a check drawn to his order for $6,000. There the President of the Copper Company endorsed Wilson's $6,000 check and got from the bank a draft for a like sum. With the bonds prepared for signature and with this $6,000 draft, the Secretary of the Copper Company accompanied Wilson to Detroit. On arriving in that city, the Secretary had the draft cashed at a local bank and turned the whole $6,000 over to Wilson. What Wilson did with it does not appear. This large sum of money was drawn and disbursed supposedly for the payment of premiums on the bonds, when, in fact, the aggregate amount of all premiums was but $655. Only this sum reached the Bonding Company. After the money had been paid Wilson, Evans, an agent of the Bonding Company, at its Detroit Office, delivered the bonds to the Secretary of the Copper Company, in the possession of which concern they remained until suit. The bonds were executed on or about April 3.

When the transactions were reported to its home office on or about May 1, 1917, the Bonding Company immediately made disclaimer and also made formal tender of the premiums paid.

The Iron Company breached its first contract in June; in fact, it delivered no iron under any of the five contracts. Testimony was offered and admitted of acts and conduct of officers of the Copper Company, following the transactions concluded by the Bonding Com-

pany's disclaimer and the Iron Company's breaches, tending to show the close relationship of the two companies and their control by the same officers. The evidence was, substantially, that the President of the Copper Company assumed control of the funds of the Iron Company on its failure to perform its sales contracts; stopped payment on checks at his will; controlled its directorate by his nominees; and in July and August caused it to vote for his protection a bond issue of $500,000 and notes to the amount of $750,000.

It was in the admission of evidence tending to establish these facts that most of the court's rulings now assigned as error were made. While there is a great number of assignments of error, the errors assigned may fairly be grouped, as was done in the plaintiff's brief, according to the subject matter to which they relate, as follows:

(1) Exception to the so-called "Underlying Agreement," admission of evidence relating thereto and charge to the jury as to the effect thereof.

(2) Exceptions to admission of evidence of misrepresentations made to the Bonding Company by officers and agents of the Iron Company without the Copper Company's knowledge and charge to the jury as to the effect thereof.

(3) Exceptions to admission of evidence of subsequent transactions between the Copper Company and the Iron Company and charge to the jury as to the effect thereof.

The record shows that the judge had a thorough grasp of the case; that he carefully kept in mind throughout the trial the precise issues made by the pleadings; and that, in his rulings, he was liberal in admitting testimony to sustain them. These issues and the manner in which they should be tried are nowhere better stated than by counsel for the Copper Company himself when addressing the judge on an objection to an offer of testimony. He said:

"The questions that arise in this case are these: First, as I understand it, were the bonds executed? Second, was there any fraud in the procurement of the bonds? Third, has there been any variation of the terms of the contract since the bonds were executed to release the surety? These are the three questions involved in this case and *any evidence that directly or indirectly bears on that is entirely appropriate.*"

[2] This statement is in accord with the practice everywhere, that when fraud is alleged, great latitude of proof is allowed, and every fact or circumstance from which a legal inference of fraud may be drawn is admissible. Any such fact, no matter how insignificant, may be shown, provided it bears at all on the point in issue. Accordingly, it is proper to prove a party's participation in the fraud by showing what was said and done leading up to the transaction, De Ruiter v. De Ruiter, 28 Ind. App. 9, 62 N. E. 100, 91 Am. St. Rep. 107; what was said and done at the time the fraud was committed, Crump v. United States Min. Co., 7 Grat. (Va.) 352, 56 Am. Dec. 116; and, within certain limits, what was said and done after the commission of the fraud. Salmon v. Richardson, 30 Conn. 360, 79 Am. Dec. 255; 12 R. C. L. 429, 430, and cases.

[3-6] It is of the manner in which the trial judge applied these

familiar principles of law in his rulings that the Copper Company complains. Its most serious complaint relates to the admission in evidence of the "Y" agreement, which, it asserts, was error, first, because the agreement had no relation to the fraud and misrepresentations of the Iron Company; and, second, because no duty rested on the Copper Company voluntarily to disclose its existence or its provisions to the Bonding Company. This contention—which covers the first group of assignments of error—raises the question, whether the Copper Company was guilty of fraud by suppressing facts which the Bonding Company was entitled to know.

Fraud may be committed by the suppression of truth as well as by the suggestion of falsehood. 12 R. C. L. 305, and cases. But the law distinguishes between passive concealment and active concealment, the distinction being that in active concealment there is implied a purpose or design. As a general rule, to constitute fraud by concealment or suppression of the truth there must be something more than mere silence, or a mere failure to disclose known facts. There must be some occasion or some circumstance which imposes on one person the legal duty to speak, in order that another dealing with him may be placed on an equal footing. Then a failure to state a material fact is equivalent to concealment of the fact and amounts to fraud equally with an affirmative falsehood. Pickering v. Day, 3 Houst. (Del.) 474, 95 Am. Dec. 291; 12 R. C. L. 305, 306, 307, 308, and cases.

We are not prepared to say—assuming the relations of the two companies otherwise free from fraud—that if the Copper Company had allowed the Iron Company to negotiate alone for the bonds, it would have been its duty to seek out the Bonding Company and inform it of the "Y" agreement. But that was not what happened. The Copper Company was rendering personal as well as financial aid to the Iron Company in securing the bonds which it exacted for its own benefit. Its officer came into direct communication with an officer of the Bonding Company and discussed the bonds. In that discussion, the Bonding Company was endeavoring to ascertain what risks it would incur on entering into the proposed indemnifying obligations. The Bonding Company, speaking through an officer, asked the Copper Company, addressing its Secretary, whether any advances had been made against the contracts it was about to assure. To that question, the Copper Company, through its Secretary, responded: "Absolutely not." If the Secretary made that reply (which he denied) he made it with full knowledge of the "Y" agreement.

What bearing had the "Y" agreement on the Bonding Company's indemnity risks? That agreement provided for an advance by the Copper Company to the Iron Company of $75,000. Just the character of the agreement it is difficult to define—whether an advance against contract deliveries of pig iron, an out-and-out loan of money, or a partnership contribution—at any event, the Copper Company paid the Iron Company $75,000 and *recited* as a "consideration" for this payment the five sales contracts in question.

These facts appearing in the "Y" agreement itself, connected with

the unusual feature that nowhere in it was there provision for the repayment or return of the money so advanced, show several things. Linking the sales contracts to the "Y" agreement by express recital and making the sales contracts a consideration for the "Y" agreement show an intimate relation between them. But for the existence of the five sales contracts there would have been no reason for making the "Y" agreement. Whatever its character, whether an advance against iron deliveries, or a loan, the Copper Company was in position, when monthly deliveries began, to deduct at will from its monthly payments the sum or parts of the sum the Iron Company owed it. If, in the last analysis, the advance was in the nature of a partnership contribution, it was even more material to the risk. With a contract outstanding, having all these provisions and possible constructions, the Copper Company, when asked by the Bonding Company concerning advances, was under legal obligation to tell about it. That question was the *circumstance* that raised in the Copper Company a legal duty to speak; and, on its failure, transformed what otherwise might have been passive silence into active concealment. The Bonding Company was seeking facts affecting the degree of its responsibility. The "Y" agreement was such a fact. It was, therefore, the legal duty of the Copper Company, when responding to the inquiry, to disclose it and to disclose it fully. The question having been asked for the purpose of ascertaining the risks involved in the situation, any equivocal, evasive, or misleading answer, calculated to convey a false impression, even though literally true as far as it went, was fraud. Pidcock v. Bishop, 3 Barn. & Cress. 605; 12 R. C. L. 309, 310, 311, and cases. It will not do for the Copper Company to say that it answered correctly when its Secretary said, on his own construction of the instrument, that no advances had been made against iron deliveries. Even if this be its correct construction, the answer given was but a half truth, for the "Y" agreement was a fact which showed the financial and contractual relations of the two companies. As such, it was material to the risks which the Bonding Company would incur in assuring to one the undertaking of the other. Failure to disclose this fact, under the circumstance of being asked for it, was an active concealment of the fact. As the fraudulent character of the concealment was provable only by the admission in evidence of the thing concealed, we are of opinion that admission of the agreement was not error, and that the agreement, together with the circumstance of its concealment, constituted evidence sufficient to sustain a finding of fraud by the jury.

In the second group of exceptions we find no error in the admission of evidence of misrepresentations made by the Iron Company, without the plaintiff's knowledge. This because it was necessary, first, to show the Iron Company's fraud and misrepresentations before it was possible to show the Copper Company's connivance therein. Evidence of connivance was present, and was sufficient, we think, to submit to the jury.

[7] In the third group of exceptions covering the admission of evidence of subsequent acts of the Copper Company and the Iron

Company, we find no error. The admission of evidence of this kind must ordinarily be guarded, but it was admissible in this case for the purpose of showing by its outgrowth what was the relation of the two companies at the time the fraud was committed. Salmon v. Richardson, 30 Conn. 360, 379, 79 Am. Dec. 255.

[8] In our review of this entire record, we have considered singly and in groups the rulings of the court assigned as error and find only a few open to question, any one of which, if technically error, is harmless error. We recognize that in the theory of the law, erroneous rulings in jury trials are presumptively injurious, yet the tendency is to enlarge the sphere of the trial judge in the admission and exclusion of testimony and not to disturb the judgment when it affirmatively appears that his rulings, if erroneous, were harmless. Fillippon v. Albion Vein Slate Co., 250 U. S. 76, 39 Sup. Ct. 435, 63 L. Ed. 853; Norfolk & Western Ry. Co. v. Gillespie, 224 Fed. 316, 320, 139 C. C. A. 552.

The judgment below is affirmed.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes