## NATIONAL SURETY CO. v. RUSSELL et al.
### No. 4909.

Circuit Court of Appeals, Seventh Circuit.

June 28, 1933.

George M. Barnard and Raymond L. Walker, both of Indianapolis, Ind., for appellant.

Arthur L. Gilliom, of Indianapolis, Ind., and Arthur L. May, Samuel Parker, Will G. Crabill, and Shepard J. Crumpacker, all of South Bend, Ind., for appellees.

Before ALSCHULER and EVANS, Circuit Judges, and CARPENTER, District Judge.

EVANS, Circuit Judge.

The case bristles with vexatious questions. Some of them were eliminated by the verdict of the jury, which was reached upon instructions to which no exceptions were taken. In fact, the judge's charge to the jury is not printed in the record, from which fact we infer it was full and complete and as favorable to appellant as that party could legitimately expect. Certain issues of fact, concerning which there was direct dispute in the testimony or in the inferences deducible therefrom, must be resolved in favor of appellees, for appellant relies solely upon the alleged error of the court in refusing its motion for a directed verdict.

Five reasons are advanced by appellant as the basis for its contention that the court erred in not directing a verdict: (a) modification of the secured contracts in such a way as to release the surety; (b) the secured contracts were never entered into by appellees and the Traders Lumber Company, or, if such agreements were effective, they were modified by agreement of the parties before appellant executed its guaranty contract; (c) appellees were not damaged by the failure of the Traders Lumber Company to perform the sales contract, but only because the Traders Lumber Company breached its loan contract; (d) the sales contracts were never capable of performance; (e) the contract price named in the sales contracts was higher than the value of the lumber which might have been delivered under the contracts as construed by appellant.

The facts may be stated, in view of the verdict, to be as follows: One Ott, president of the Traders Lumber Company, obtained timber cutting rights upon two sizable tracts of land in North Carolina, upon which there was supposed to be a large quantity of standing timber, and through one Menasco, contacted with appellees to secure financial aid with which to cut, manufacture, and market lumber obtainable from such timber. Negotiations between Traders Lumber Company and appellees led to two separate contracts, one known as the sales contract and the other, a loan contract. By the terms of the first sales contract the Traders Lumber Company agreed "to sell and to deliver to appellees, f. o. b. cars at Wallace, North Carolina, 6,000,-000 feet (board measure) of rough-sawed, commercial and of merchantable quality, No. 1 Green Long Leaf Yellow Pine lumber, squared and sized in lengths commonly used in the trade," for the price of $15 per thousand feet, payable on or before thirty days

after the date of each bill of lading, at such place or places as might be designated in writing by appellees. Menasco was named as the trustee and designated as the party of the third part. The substance of the agreement is set forth in the margin.[1]

The loan contract was between the lumber company and appellees, material portions of which contract are set forth in the margin.[2]

## Sales Contract.

"1* *'* (Traders Lumber Company) agrees to sell to * * * (appellees) and to deliver to * * * (Menasco) for the use of * * * (appellees) F. O. B. cars at Wallace, North Carolina, * * * 6,000,000 feet * * * of rough-sawed, commercial and of merchantable quality, No. 1 Green Long Leaf Yellow Pine lumber, squared and sized in lengths commonly used in the trade, for * * * $15.00 per thousand feet * * * payable on or before thirty days after date of each bill-of-lading, at such place or places as may be designated in writing by (Traders Lumber Company) * * * to (Menasco). * * *

"* * * Such lumber is to be cut from two adjoining timber tracts, located in Duplin and Pender Counties, North Carolina * * *.

"Deliveries shall begin on or before October 1, 1929 and shall be made at the rate of approximately * * * 500,000 feet * * * per month, until a total of * * * 6,000,000 feet * * * shall have been delivered. * * *

"It is further agreed that. * * * (Menasco) will provide * * * (Traders Lumber Company) with shipping instructions, for all of said lumber so delivered on board cars, and * * * (Traders Lumber Company) will ship said lumber according to such instructions, and will promptly forward to * * * (Menasco) at No. 913 Hume-Mansur Bldg., Indianapolis, Indiana, bills-of-lading for all such shipments.

"The (appellees) * * * agree to purchase said * * * 6,000,000 feet * * * of lumber from * * * (Traders Lumber Company) and that said Menasco, Trustee, will accept the same when delivered in accordance with this contract, and will pay the stipulated price for each carload delivered within thirty days after date of bill-of-lading therefor. * * *

"* * * a performance bond in the penal sum of not less than * * * $37,500, guaranteeing the faithful performance by the (Traders Lumber Company) * * * of the agreements herein contained on its part to be performed, executed by a reliable surety company * * * shall be procured and delivered by the (Traders Lumber Company) * * * to * * * (appellees) and that this contract shall be binding and effective immediately on the furnishing of such bond * * *."

## Loan Contract.

"2 Whereas, * * * (Traders Lumber Company) is the owner * * * of the timber on a tract of land containing * * * 14,411 acres, in Pender County, North Carolina, * * * and Tract 'A' in Duplin County, North Carolina, containing seventy-five hundred fifteen * * * acres, * * * and

"Whereas, * * * (Traders Lumber Company) desires to borrow from * * * (appellees) the sum of * * * $35,000 * * * to be used for the purchase of equipment, and for all other expense incident to and connected with the development, cutting, sizing, and delivery of green Yellow Pine timber located on said several tracts * * * and * * * (appellees) have agreed to advance said sum of * * * $35,000 * * * (to Traders Lumber Company) for the purposes aforesaid:

"Now Therefore, it is agreed that the terms and conditions upon which said loan shall be made, and the provisions for the re-payment thereof, shall be as follows, to-wit:

"Under separate agreement, in writing, made be-

By the first loan agreement, appellees agreed to loan to the Traders Lumber Company, $35,000. One of the conditions of the loan was that Traders Lumber Company's obligations under the sales contract were to tween the parties hereto, the performance of which by the * * * (Traders Lumber Company) is to be guaranteed by a responsible surety company, provision is made for the delivery by * * * (Traders Lumber Company) to * * * (Menasco) of * * * 6,000,000 feet * * * of No. 1 green Long Leaf Yellow Pine, rough-sawed, commercial and of merchantable quality, squared and sized in lengths commonly used in the trade, at the rate of approximately 500,000 feet * * * per month, beginning on or before October 1, 1929, and continuing until all of said 6,000,000 feet of lumber should be delivered F. O. B. cars Wallace, North Carolina, for which * * * (Menasco) shall pay to * * * (Traders Lumber Company) $15.00 * * * per thousand feet * * * 30 days after date of bill-of-lading for each car so delivered.

"1. * * * From·each sum to be thus deposited with * * * (Menasco) and paid over to (by) him to * * * (Traders Lumber Company) there shall be deducted by (appellees) * * * an amount equal to * * * 8 per cent interest per annum from date of advancement by * * * (appellees) * * * to October 1, 1930.

"* * * (Traders Lumber Company) agrees to repay said sum of $35,000 * * * to the * * * (appellees), as follows, * * *

"$2,916.67 * * * on or before November 1, 1929, and a like sum on or before the first day of each succeeding month until said sum shall be fully paid.

"2. As a further inducement to the * * * (appellees) to make said loan * * * (Traders Lumber Company) further agrees to pay to (appellees) * * * a sum equal to * * * 50c for each one thousand feet * * * of lumber which may at any time hereafter be cut and marketed from all of the timber lands above described * * *. * * * (Traders Lumber Company) * * * agrees· that it will, within the time allowed to it under leases and deeds, cut and market not less than· * * * 100,000,000 feet of timber from the lands aforesaid, and failing to do so will pay to * * * (appellees) a sum equal to 50c per thousand, or the difference * * * between 100,000,000 feet and the total quantity cut and marketed.

"3. All lumber delivered by * * * (Traders Lumber Company) to * * * (Menasco) F. O. B., Wallace, North Carolina, shall be consigned in the name of * * * (Menasco), as directed by him, and (Traders Lumber Company) * * * shall make sight draft on each consignee, payable to (Menasco) * * * and transmit such a sight draft, accompanied by bill-of-lading * * * to * * * (Menasco) at No. 913 Hume-Mansur Bldg., Indianapolis, Ind. * * * (Menasco) shall collect the proceeds of all such drafts, and deposit the same in his own account, as Trustee, and account for the same as follows: He shall first pay to (Traders Lumber Company) * * * on all invoices for lumber delivered to him * * * $15.00 per thousand feet * * * such payment to be made within thirty days after date of bill-of-lading for each delivery. The Trustee shall, beginning November 1, 1929, and on the first day of each succeeding month thereafter, pay to (appellees) * * * from the proceeds of the sale of said lumber, the sum of * * * $2,916.67 * * * until said sum of * * * $35,000 has been fully repaid * * * and shall, also * * * pay over to (appellees) * * * a sum equal to * * * 50c per thousand feet for all lumber, including the lumber delivered to the Trustee, cut and marketed by * * * (Traders Lumber Company) during the preceding month. The balance, if any, remaining * * * shall be paid over to * * * (Traders Lumber Company).

"* * * (Traders Lumber Company), may, in lieu of * * * monthly deliveries * * * of lumber, * * * pay * * * to (Menasco) * * * a sum

be guaranteed by a responsible surety company.

Two other agreements of like character were executed by the same parties, the sales contract calling for the sale of 1,000,000 feet of lumber and the loan contract calling for appellees' loaning $5,000 thereon. Mr. Ott, for the Traders Lumber Company, applied to appellant for bonds to secure its performance of the sales contracts. Its applications were accepted by appellant and for the usual premiums. Two surety contracts were executed which were delivered to appellees. No indemnity was taken by appellant from the Traders Lumber Company. No representations were made by appellees. The Traders Lumber Company failed to deliver any lumber under either contract. Its failure so to perform was explained by its president on the ground that it had been grossly deceived and defrauded by those from whom it had purchased the timber. The undisputed evidence established the fact that there was no substantial amount of timber upon the premises leased by the Traders Lumber Company and the latter company failed to acquire sufficient timber from owners of adjoining property to permit it to carry out its contract with appellees.

The record is replete with letters and telegrams between Traders Lumber Company and appellees, explaining and attempting to avoid the former's default and attempting to secure modifications of the agreements so as to permit the Traders Lumber Company to secure a delayed performance of its contract. This correspondence also shows that the Traders Lumber Company received orders for a large amount of the lumber from outside or third parties. Menasco, as trustee, gave no orders for the shipment of lumber to appellees as provided for in the contract, which failure on his part was explained by the fact that Traders Lumber Company had no lumber to deliver and frequently so advised Menasco.

A considerable amount of testimony was received bearing upon the value of such lumber, and, as usual, there was a considerable range in the estimates. The evidence was such that the court could not have directed a

equal to the monthly payment of * * * $2,916.67, plus an amount equal to * * * 50c per thousand feet * * * on all lumber cut and marketed by * * * (Traders Lumber Company).

"* * * When * * * the full sum of * * * $35,000 has been repaid to (appellees) * * * the Trusteeship of (Menasco) * * * shall cease and (Traders Lumber Company) * * * shall thereafter pay directly to * * * (appellees) * * * the sum of * * * 50c for each 1,000 feet of lumber cut and marketed by them from the timber tracts aforesaid."

verdict on this question of damages unless it gave such construction to the contract of the parties as would permit of the delivery of an inferior grade and size of lumber which was worth less than the price mentioned in the contract.

We reject, without any discussion of the evidence upon which our conclusion is based, the grounds (c) and (e) advanced by appellant in support of its motion for a directed verdict. To sustain its contention, appellant is compelled to advance a construction of the contract which the court could not and did not adopt. We can not give to the language "rough-sawed, commercial and of merchantable quality, No. 1 Green Long Leaf Yellow Pine lumber, squared and sized in lengths commonly used in the trade," a construction which would permit the Traders Lumber Company to deliver only the inferior grade and size of lumber obtainable from the standing timber on the lands described in the sales contract. Surely the testimony on this phase of the case was such that a verdict in appellant's favor could not have been properly directed thereon. The parties to the agreement were in accord as to the meaning of the language by them used. Letters written by Ott for Traders Lumber Company shortly after the agreement was executed also placed a construction upon the contract which was in harmony with the testimony of at least one disinterested witness.

Upon a rejection of appellant's construction of this contract, the issue of damages was clearly one for the jury.

Likewise we are not favorably impressed with the argument (d), that the contract was incapable of performance when entered into (because there was not sufficient standing timber on the lands described in the contract to produce 7,000,000 feet of lumber), and therefore the surety was released from liability for the seller's performance. Even though there was not enough standing timber to produce all of the lumber called for in the contract, the seller was not entirely relieved from performance of the contract. He was obligated to cut such timber as was available and to deliver the lumber obtained therefrom. It appears that there was some standing timber on the land and yet there was no delivery of any lumber. Appellees were therefore entitled to some damages, even though appellant's theory be accepted, and the court could not therefore grant appellant's motion for a directed verdict.

Moreover we are satisfied that the contract did not limit the Traders Lumber Com-

pany to lumber made from timber on two particular tracts of land located in North Carolina. The tracts are not described but referred to as "Two adjoining timber tracts, located in Duplin and Pender Counties, North Carolina, comprising approximately * * * (36,336) acres owned and/or leased by party of the first part, and from trees which have not been bled or turpentined." The surety contract merely describes the lumber as follows:

"Whereas, said principal has entered into a certain contract in writing, bearing date June 22nd, 1929, with the said obligee for delivery of six million feet of timber f. o. b. cars Wallace, N. C. * * *."

The Traders Lumber Company from the first insisted that under the sales contract it had the right to deliver lumber from timber cut from adjoining tracts of land, and this claim was not disputed by appellees.

If the parties by their agreement limited the sources of the lumber sold to two tracts, the inquiry naturally arises, What tracts, and where were they located? An answer can not be found in the contracts themselves. Evidence *aliunde* the agreements is necessary to locate such tracts. But such oral evidence is to the effect that the seller was not limited to any particular tract, and such evidence is supported by inferences deducible from the language used in the agreements. "Comprising approximately 36,336 acres" is not particularly precise when applied to the sale of lumber which, in case of good timber tracts, could be cut from a couple of sections of land. Then, too, the words "owned *and/or* leased" accompanied by the vague description "in Duplin and Pender Counties, North Carolina" suggest rather strongly that it was lumber of a designated kind, rather than lumber from a designated piece or parcel of land, which was the subject of sale. Finally, the statement "from trees which have not been bled or turpentined" strengthens the impression that the parties were concerned about the quality of the trees rather than their location.

This general impression is further confirmed by the second agreement which called for only 1,000,000 feet of lumber and yet described the region from which it was to come in the same indefinite yet comprehensive language.

And finally it appears that the seller, before the sales contract became effective, was *required to secure and did obtain a bond* which recited the terms of the sales contract as being:

"Whereas, said principal has entered into a certain contract in writing * * * with said obligee *for delivery of six million feet of timber f. o. b. cars Wallace*, North Carolina * * *."

This language rather conclusively establishes the understanding of all of the parties to the effect that it was timber "f. o. b. cars, Wallace, North Carolina" rather than lumber from certain tracts of land in North Carolina that was bargained for.

■ There remain for disposition two other grounds, (a) and (b), to support appellant's motion for a directed verdict, which grounds will be considered together. Their disposition calls for the consideration of the questions: (1) Was the sales contract in force when appellant executed its surety contract? (2) Was the sales contract modified by the loan contract? If question (2) be answered in the affirmative, was the modification such as to release the surety from liability?

We are unable to say the sales agreement was but a form, binding neither on the Traders Lumber Company nor on the appellees. That there is evidence from which such a conclusion might be drawn must be conceded. But we think appellee Becker, on the witness stand, stated the facts fairly and frankly when he said:

"I told the parties that were associated with me that if I was to be interested in the deal, I would not be interested unless there was six million feet involved, instead of five, and that a responsible surety company would give a performance bond guaranteeing the performance of that contract. As a party to this contract for six million feet, it was my intention that this lumber should be sold, and delivered to the trustee. There was a discussion as to the sale of the six million feet. I told Mr. Ott that I was not in the lumber business, and had no time to dispose of this lumber as it was shipped, five hundred thousand feet a month, and Mr. Ott said: 'You don't have to worry anything about that, because I have got more orders now than I can fill. I will be able to dispose of it, and I will send the trustee bills of lading, invoices and shipping instructions.' If the payments provided for in the loan contract were not made, it was my intention as a party to the lumber contract that the lumber be delivered."

Such evidence, under any view of it, called for the submission of this issue to the jury.

Even though appellees never expected personally to receive a foot of lumber under either contract (better price being obtainable by the seller from other parties), the inescapable fact remains that an obligation to accept and pay for the lumber was provided for by said contract from which there was no legal avoidance. Nor is the fact that appellees were chiefly interested in the loan contract particularly significant. The evidence shows that appellees were sought out in the first place to advance the money with which the Traders Lumber Company was to carry on its operations. It is likewise established with certainty that the selling of the lumber to appellees was but a step or a means whereby the loan contract was to be more adequately secured. But these facts do not militate against the binding effect of the sales contract nor against the liability of a surety which guarantees the seller's performance of it. It matters not whether the parties were primarily interested in the loan contract and were attempting to secure the repayment of the loan or were buying and selling lumber to be manufactured and as an incident thereto made a loan to insure the performance of the sales contract. If the two contracts were in force, and if the loan contract did not modify the sales contract, then the surety securing the sales contract is liable for its principal's breach of it. That is the situation which we find here existing.

■ Two separate kinds of contracts were made. Both were binding on the parties to them. One kind only was guaranteed by appellant. Inasmuch as appellees made no representations whatsoever to appellant and were under no duty so to do, any fraud or misrepresentation practiced by the principal upon appellant cannot be attributed to appellees. Copper Process Co. v. Chicago Bonding & Ins. Co. (C. C. A.) 262 F. 66, 8 A. L. R. 1477 and notes.

Whether the loan contract modified the sales contract and the modification was sufficient to affect surety's liability, is, we think, the determinative question on this appeal.

In analyzing the two agreements, the following facts must be considered. The agreements were made and executed by the same parties at the same time. The surety was informed of the existence of only one—the sales contract. It had no knowledge of the existence of the loan contract. The sales contract did not refer to the loan contract, but the latter referred to the former.

There are but two modifications, or possible modifications, which necessitate consideration. Paragraphs numbered 1, 2, and 3 of the loan contract should be read in the light of the first paragraph of the sales contract.

Paragraph one of the sales contract provides for the unqualified sale of 6,000,000 feet of lumber by Traders Lumber Company to the appellees for which the latter through its trustee agrees to pay $15 per thousand feet, thirty days after date of the bill of lading for each car.

By the terms of the loan contract the parties agreed that "From each sum to be thus deposited with the party of the third part (the trustee), and paid over by him to party of the first part (Traders Lumber Company), there shall be deducted, by parties of the second part, (appellees) an amount equal to eight (8) per cent interest per annum from date of advancement by parties of the second part, to October 1, 1930." The Traders Lumber Company also agreed,

"to pay to the parties of the second part, (appellees) a sum equal to fifty (50¢) cents for each one thousand feet (board measure) of lumber which may at any time hereafter be cut and marketed * * *."

The loan agreement also provided:

"The Trustee shall, beginning November 1, 1929, and on the first day of each succeeding month thereafter, pay to the parties of the second part (appellees), from the proceeds of the sale of said lumber, the sum of * * * $2,916.67 * * * until said sum of * * * $35,000 * * * has been fully repaid to the parties of the second part, and shall, also, set aside and pay over to the parties of the second part, a sum equal to fifty cents per thousand feet, * * * for all lumber cut and marketed by the party of the first part during the preceding month."

In other words, when the surety guaranteed the seller's performance of the sales contract, it was informed by said agreement that the lumber to be cut was all sold and was to be paid for by a responsible party, to-wit, the appellees, thirty days after the date of each bill of lading, at the rate of $15 per thousand feet of lumber. By the terms of the loan contract, the trustee was to deduct the sum of $2,916.67 each month and also the further sum of 50c per thousand feet of timber delivered under the contract from the $15 per thousand feet paid to him by the

buyer and return these sums to the buyer to satisfy the loan. The loan contract also provided for the payment of 50c on every thousand feet of lumber cut and marketed by the Traders Lumber Company up to 100,000,000 feet, although this provision was probably not a modification of any provision of the agreement which was guaranteed.

This narrow question is then presented: Did the loan contract materially modify the provision of the sales contract which obligated the purchaser to pay $15 per thousand feet of lumber? And if so, was it a material modification?

■ We are satisfied that, if a modification occurred whereby the purchase price was reduced, it was a material one and released the surety. Board of Commissioners of Morgan County v. Branham, (C. C.) 57 F. 179; Markland Mining Co. et al. v. Kimmel, 87 Ind. 560; Detroit Fidelity & Surety Co. v. Bushong, (Ind. App.) 175 N. E. 683; 21 R. C. L. 1007.

■ But did the loan agreement modify the sales agreement in respect to the amount or time of payment? We think not.

■ Additions or supplements, which do not conflict with and therefore do not change the obligations of the parties to the original agreement, may be made to an agreement. To illustrate: After one agreement has been executed for the sale and purchase of lumber to be cut from standing timber, parties may make a new contract wherein and whereby they agree that, at the close of the first agreement, one will sell and the other will buy an additional amount of lumber at different prices and different deliveries. Such a new agreement would not modify the old agreement, and the surety would not be released thereby. In the case before us, the price at which the lumber was sold was not changed by the loan agreement. It remained $15 per thousand feet. The date of payment was the same. The same provision for a trustee existed. This trustee acted for both parties. He was the representative of the purchaser to notify the seller of the place to which the lumber should be shipped. He was the representative of the seller to whom the buyer could make payments of $15 per thousand feet within 30 days from the loading. Wherein, then, was there a modification of the agreement? The loan agreement merely provided that the trustee, *after receiving the money and when there had been a full compliance with the purchase and sales contract,* should distribute the proceeds of the sale

between the seller and his creditors, the loaner, who happened to be the buyer. It necessarily follows therefore, it seems to us, that the loan agreement did not, in fact, change the obligations of the sales contract.

The judgment is affirmed.