Schubert et, Plaintiffs-Appellees, *v.* Neyer,
Defendant-Appellant.

Ohio Appeals, First District, Hamilton County.

No. 8651.   Decided December 21, 1959.

*Messrs. Weber, Hensley & Nurre*, for plaintiffs-appellees.
*Messrs. Rolf, Dolle, Rueger, Mongan & Leming*, for defend-
ant-appellant.

O'CONNELL, J. Some of the facts in this case are in dispute. However that sometime prior to 1952, the appellant purchased two lots on the westerly side of Wesselman Road in Hamilton County; that during the fall of 1952, he, along with his brother, Frank Neyer, began the construction of a one family house on the southerly of the two lots; that he completed this residence in 1953; that during the course of construction he built a retaining wall in the rear; that he and his family moved into the said residence in January or February, 1953, before its completion; that the said retaining wall was completed in June, 1953; that in the spring of 1953 the appellant and his said brother began building the second residence; that the appellees purchased the house on the southerly lot (house No. 1) in February, 1954, are agreed to by both parties.

According to the plaintiff, "because of the steep grade of the lots it was necessary to excavate for the concrete slab foundation of both houses by cutting a terrace on which the houses were placed." As a result of the rains during the Spring of 1953, house No. 1 in which defendant was residing was on several occasions inundated by surface and sub-surface water and by soil washed from the steep grade behind the home of defendant. Consequently defendant caused the construction of a retaining wall behind the two buildings. This wall was a continuous wall running across both the lot behind house No. 1 and house No. 2. The wall was placed on a continuous footer running across both lots, and this footer was located approximately ten (10) feet to the rear of both houses. The footer was constructed of reinforced concrete, two and one-half (2½) feet deep, and twelve (12) to fifteen (15) inches wide. On top of this footer was placed a mortared field stone wall about one and one-half (1½) feet high. Because of the steep grade behind this wall, earth and water washed over it and defendant subsequently raised the height of the field stone portion of the wall. Thereafter the earthslide behind the wall forced the wall down and broke the footer in that portion of the wall located

behind house No. 1 occupied by defendant. The wall behind house No. 2 was not similarly destroyed.

"Defendant, in the Fall of that year, 1953, then excavated an additional ten (10) feet to the rear of the location of the first wall behind house No. 1 and constructed a second wall. This wall was located on a footer of reinforced concrete thirty (30) inches wide and three and one-half (3½) feet deep. A mortared field stone wall four (4) feet high was placed on top of the footer. The construction of this wall was completed in September or October of 1953. After the completion of this second wall behind house No. 1, defendant caused the hill behind the wall to be re-graded. Defendant also installed a field stone patio extending from the rear wall of his home to the old footer of the first wall.

"Within a few months the earthslide behind the new wall had cracked even this formidable retaining wall to such an extent that trained eye could detect the vulnerability of the wall."

For these assertions, the plaintiffs had to rely largely upon the testimony of Richard F. Thaler, a general contractor, who lives next door (to the north) of the lots owned by the appellants. The said Thaler also did excavating for the appellees after the hill behind their premises had slid onto the said appellee's premises.

Now, according to this witness, similar slides had taken place during the period in which the appellant had occupied the said premises. First, he testified (Record pp. 33, et seq) that there was a retaining wall behind house No. 1, beginning at the North property line and running as one continuous wall in the rear of the house on the northerly lot (house No. 2); that this wall was about 13 or 14 feet behind the houses; that it consisted of a footing (of reinforced concrete and a stone wall on top which was 3½ feet high behind House No. 2, and 4 feet behind House No. 1); that "it wasn't very long the first wall just raised up and bulged out and the dirt came right on up towards the house"; that Mr. Neyer (appellant) was living in the property at the time; that it (the wall) just crumpled over"; that thereafter Mr. Neyer "dug it out, excavated the dirt out, only he went further back and got in a backhoe and dug a big trench then and he throwed (sic) in a big footer"; that the appellant

put in this second footer of reinforced concrete "on the lot that Mr. Schubert now owns"; that he also put up another stone (field stone) wall of "fairly good" construction (14 to 18 inches thick); that the appellee was living in the house at the time the second wall was built; that later a "crack (in the wall) showed up"; that after the first wall had been broken "the hill" started to break up; that appellant after the second wall had been built, regraded (behind the wall); that when the appellees had moved in the wall had a crack in it (to the right of the center) (there was no crack in the footer); that thereafter "the wall just started to keep bulging out and every time you had a rain, the rain would come right over the wall and bring top soil right over with it and wash it right up to the house—and you would have a big puddle of water sitting right in the back of the house; there was no place for it to go but go right through underneath the door and right through the kitchen."

Called also by the plaintiff was Louis W. Miller, who testified that "it (mud) came over the wall through the back door into the utility room"; and Robert Kelley, who testified that "the hill was sliding down, climbing up behind the house. When it would get up you could step on the roof, he would call me up and I would get it out so they could get the door open."

However, the appellant, Walter J. Neyer, testified differently. First he denied that the original wall had extended across the entire property, as follows (Record, p. 239):

"Q. Now, isn't it a fact, Mr. Neyer, that when you had the footer put in on lot number 2 you had the footer put in on lot number 1 and ran a continuous footer across both lots?

"A. Definitely not.

"Q. You deny that?

"A. I deny it. Definitely not."

Witness Birchell Swafford, called by the appellant, also testified that the wall was behind House No. 1 only.

Secondly, the appellant denied that the hill slides had poured earth over the back yard of House No. 1 while the said appellant was residing in the said House, as follows: (Record, p. 6)

"Q. Was there any water there in June, 1953?

"A. No, there was no water sitting in the yard. If it was raining there would be water there.

"Q. Now, after you and your family moved into the house did you have any problem with water coming into the house?

"A. No, not—No problems as far as water. In other words, I kept it drained so that it wouldn't run in the house. I kept it graded around there as much as I could so that it wouldn't go into the house.

"Q. Did you ever have any problem with mud coming into the house?

"A. No. The backyard was muddy."

This latter testimony of his was confirmed by his wife who said (on the witness stand) as follows:

"Q. During the time that you lived there, Mrs. Neyer, at any time did the rear hill slide down into your kitchen?

"A. No, it did not.

"Q. Did it slide down to such an extent as you had problems with mud and water coming up into your kitchen?

"A. No, sir, it did not."

Claiming fraud had been perpetrated, the appellee asked for rescission of the contract of sale and damages, both compensatory and punitive.

The jury brought in a verdict for $5,600.00 in favor of the appellee. It is from the judgment entered on this verdict that the appellant has instituted proceedings in this Court.

The question to be decided in this case is whether or not the jury was justified in returning a verdict for the appellee, for the reason that the conduct of the appellant constituted fraud or concealment or failure to disclose facts when such facts should have been disclosed as a matter of law.

The only representation made by the appellant to the appellee is to be found in the record on p. 73 as follows:

"Q. When you asked him about the house what did Mr. Neyer say?

"A. He said it was all in good shape and his wife remarked that we were getting a good house."

Now the matter of the sliding earth, the mud and the water's coming into the house, the wall and its destruction are all in dispute.

But, let us assume (and we feel that this assumption is necessary under the circumstances) that the wall had been destroyed, the water and mud had flowed into the house during

the occupancy of the appellant. Does the failure of the appellant to disclose such facts to the appellee constitute fraud or concealment or that silence which constitutes fraud? Certainly the most that can be charged to the appellant is mere failure to speak when such failure results in misrepresentation. Also it is clear that there was no positive act on the part of the appellant that could be called fraud, or misrepresenation or concealment. There was no suppression of the truth or concealment of a material fact.

As 24 Ohio Jurisprudence (2d), 678, puts it: "The simple failure to disclose a fact is not equivalent to its concealment."

And in 37 Corpus Juris Sec., pp. 242, at 243, we find that "mere silence is not representation and in the absence of a duty to speak, * * * silence as to a material fact does not of itself constitute fraud, * * *"

Also there is a distinction between concealment of a fact and failure to disclose a fact. So *Talcott* v. *Henderson*, 31 Ohio St., 162, at 165, holds that: "While, therefore, a purchase of goods by an insolvent vendee, who conceals his insolvency, with intent to injure the vendor, is fraudulent and voidable, yet a purchase under like circumstances, save only that such intent is absent, is not, in law, fraudulent."

However, we do not claim by any means that failure to speak never constitutes fraudulent concealment. When confidential relations exist, such as those of trustee and beneficiary, guardian and ward, attorney and client there is often a duty to speak, because the parties are not equals. Other situations require disclosure of all relevant facts, such as binding one-self in such regard by contract or being one in possession of superior knowledge or the means of acquiring such superior knowledge. It might be added here that in all cases of fraud or concealment, there must be an intention to deceive and the deception must relate to a material fact. Moreover, the representee must have relied on the falsity as an inducement to his action. This state of dependency therefore logically requires a greater degree of revelation than exists otherwise. And failure thus to reveal fully and completely results in fraud and misrepresentation. Nor does the relation of buyer and seller itself impose the duty to speak. From the syllabus of *Goodale* v. *James G. Hunt* (Hamilton County District Court), 6 Ohio Dec. Rep., 897, there is the

following: "The duty of disclosure may arise from the circumstances of the sale, but not from the mere relation of buyer and seller."

In 24 Ohio Jurisprudence (2d), 683, it is said that: "it is generally held that mere silence does not constitute fraud where it relates to particular facts and matters of such a nature as to be equally open to common observation or visible to the eye, where such facts are discoverable by the exercise of ordinary diligence."

Now the appellee in this case had visited the premises and had inspected them. He had known that there was a hill behind the house. He had known, or should have known, that hills do slide. If there had been any question in his mind as to whether or not this hill would be apt to slide, he could have, and should have called upon an expert for his opinion.

Let us look at the testimony of the witness in this regard (Record, pp. 78, 79, 80):

"Q. At the time you looked at the property did you examine the interior of the house and the exterior in the yard?

"A. Yes. I examined the interior of the house and I walked back on the patio. You could not go back on the property since it was December and the hill was not passable, we weren't dressed for that sort of thing.

"Q. You say at the time you looked at the house there was a patio?

"A. There was.

"Q. Where was the patio located?

"A. Directly behind the house. It extended about, I would say, 8, 10 feet behind the house and ran the full length, 45 feet, of the house.

"Q. The patio ran the length of the house?

"A. That's correct.

"Q. In this direction (indicating)? About how deep?

"A. I would say 8, 10 feet, somewhere in that vicinity. I never measured actually the size but it's very close.

"Q. What did you notice, at the end of the patio towards the rear of the lot, if anything?

"A. At the end of the patio there were some small cement stones at the edge of the patio, slightly smaller cement stones, and then there was probably 3 feet of dirt, and behind the 3

feet of dirt was a retaining wall, a retaining wall roughly 3 feet high on top of the footer, and behind that was a hill immediately.

"Q. What was the construction of the retaining wall?

"A. It was a fieldstone wall supported with concrete and on a footer. It was approximately 90 feet long, I would say, the length of the property.

"Q. And what was the construction of the patio which you mentioned?

"A. It was also fieldstone, flat fieldstone, lying down with cement holding it together.

"Q. Did you notice anything else about the back of the lot?

"A. No, sir, I could not go up on the hill. I could have gone up on the hill but I did not go up on the hill.

"Q. Did anyone point out to you approximately how much further behind the house your lot lay?

"A. They pointed out—We stood back on the patio and Egner explained to me how far back the property ran."

It will be noticed that the appellee said that on the one hand he could not go up the hill because it was not passable and that he was not dressed for such undertaking, but that on the other hand he could have gone up the hill, but he did not go up the hill. Thus he was not exercising that care that should have been exercised under the circumstances.

So in 23 American Jurisprudence, 826, it is said that "In respect of whether a fraudulent representation as to the extent or proportion of land of a particular kind included within a tract is actionable, where the representee inspects the land, it may be said that ordinarily where a person of judgment and experience personally inspects real estate and is in no way prevented from forming an independent judgment as to the acreage of different portions thereof, and does form such a judgment, he will not thereafter be permitted to say that he relied upon the representation as to the acreage, and recover his damages on the theory that such misrepresentation is actionable."

And in paragraph 8 of the syllabus in *Dieterle, Plaintiff-Appellant*, v. *Bourne et, Defendant-Appellees*, 40 Ohio Law Abs., 550, it is said that: "A charge that if the jury found from the evidence that in an action for damages for false representa-

tions inducing a sale of real property, the purchasers had full opportunity of examining the property they purchased and could easily ascertain its quality and value by inspection and they failed to do so, the injury they sustained was the result of their own folly and the jury must find against them, correctly states the law." ·

And Kerr on *Fraud and Mistake* (5th Edition by Sidney Edward Williams, 1920) has this to say in the matter: "The law requires men in their dealings with each other to exercise proper vigilance and apply their attention to those particulars which may be supposed to be within the reach of their observation and judgment, and not to close their eyes to the means of information which are accessible to them: vigilantibus, non dormientibus, jura subveniunt. If parties are at arms' length, either of them may remain silent and avail himself of his superior knowledge as to facts and circumstances equally open to the observation of both or equally within the reach of their ordinary diligence, and is under no obligation to draw the attention of the other to circumstances affecting the value of the property in question although he may know him (the other party) to be ignorant of them. If, for example, a man treats for the purchase of an estate knowing that there is a mine under the land and the other party makes no inquiry, the former is not bound to inform him of the fact."

Also, from the same text, there is the following: "It has never, it is believed, been held by our courts that there is any general obligation to disclosure on the part of the vendor or purchaser of chattels or realty though the person maintaining silence may know that the other party is acting under an erroneous impression."

And Cooley in *A Treatise on the Law of Torts*, by Thomas M. Cooley, LL. D. (4th Ed. by D. Avery Haggard, 1932) in Vol. 2, p. 556, maintains that "where sources of information are equally open to both parties to any dealings, and the one obtains an advantage of the other without resort to any trick or artifice of concealment calculated to throw the other off his guard or to any false presentation of facts, the advantage he gains is deemed legitimate, and the losing party must bear such loss as has resulted from his own want of viligance, or prudence."

In this regard it should be added that if at any time of the negotiation the subject matter of the transaction is inaccessible, "the representee has not the right to rely upon representations in respect thereof." (23 American Jurisprudence, 969). However, in this case the premises were not thus inaccessible, although the hill involved might not have afforded normal access.

Moreover, what duty was placed upon the appellant? Could he not have taken the position that though there had been a landslide with the resultant destruction of the wall, he had built another wall, which, in his opinion, was sturdy and able to hold back future hill slides? Was he under the obligation of revealing the slide and thereby probably spoiling the sale? In the final analysis, was he to advise the buyer that perhaps the latter should look elsewhere for a house? Was the situation such that he would thus be forever barred from selling his property unless perhaps he moved the entire hill to the rear?

Now in Ohio "it has always been held that if a lessor has knowledge of defects in the premises which are not discoverable by the tenant upon practical examination and which will imperil his person or his property there is actionable fraud in the failure to disclose them." 24 Ohio Jurisprudence (2d), 685. However, in the case before us there were no such defects. It is true that Richard F. Thaler, witness for the appellee, testified (R. 62) that he noticed a crack in the second wall at about the same time that the appellee bought the house. However, such defect (if such there was) was patent, not latent. Certainly it could have been observed by the appellee during his examination of the premises.

Moreover, there were no statements made by the appellant in reference to the premises other than to state that they were in good shape. The appellant's wife added that "we were getting a good house." There was no mention of hill slides, with the resultant mud and water's flowing into the house and the requiring of equipment to remove the mud from the back yard.

"As a general rule" says 23 American Jurisprudence, 852 "to constitute fraud by concealment or suppression of the truth there must be something more than mere silence, or a mere failure to disclose known facts." Such was also the holding in

paragraph 4 of the syllabus in *Cooper Process Co.* v. *Chicago Bonding & Insurance Co.* (C. C. A., 3d), 262 Fed., 66, 8 A. L. R., 1477, as follows: "As a general rule, to constitute fraud by concealment or suppression of truth, there must be something more than silence; that is, there must be some occasion which imposes on one person the legal duty to speak in order that he may be placed on an equal footing, in which case failure to state a material fact is equivalent to a concealment and amounts to fraud equally with affirmative falsehood."

Furthermore, "where there is no obligation to speak, silence cannot be termed suppression and is not a fraud." (23 American Jurisprudence, 852.)

So, in syllabus 3 of *Farras* v. *Churchill*, 135 U. S., 609, it is held that: "if a purchaser of real estate, to whom representations of the character and value of the property are made by the vendor, visits the property itself prior to the sale, and makes a personal examination of it touching these representations, he will be presumed to rely on his own examination and not upon the representations of the vendor and in the absence of fraud or concealment cannot have the sale set aside."

It is the opinion of this Court, as we have already indicated, that there was no obligation on the appellant to reveal the story of the earthslides, for "a court of equity does not undertake to compel obedience to the highest requirements of honesty and morality in the transactions of men." *Willett Hemingway, Admr.* and *Another* v. *Michael Coleman,* 49 Conn., 390. Certainly, a court of law should require no higher standards.

And as Lord Cairns in *Peck* v. *Guerney* (L. R. 6 H. L., 377, 403, 1873), put it "mere non-disclosure of material facts, however morally censurable, would in my opinion form no ground for an action in the nature of an action for misrepresentation." And from *The Law of Torts* by Fowler V. Hooper and Fleming James, Jr., Vol. 1, p. 586, the following: "Where parties are dealing at arms' length, neither can complain of the mere silence of the other."

23 Am. Jur., 853, states the circumstances under which silence amounts to fraud, as follows: "Silence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the

other contracting party, whether the duty arises from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances. In other words, there must be a concealment, the party sought to be charged must have had knowledge of the facts asserted to have been let remain undisclosed, and the silence must, under the conditions existing, amount to fraud, because it amounts to an affirmation that a state of things exists which does not, and the uninformed party is deprived to the same extent that he would have been by positive assertion.''

There is no rule (nor could there very well be one) which can be followed in determining whether the duty to speak is imposed upon one. Rather, each case rests on its own merits.

By way of summary, the facts in this case disclose a purchase of real estate by the appellee from the appellant, the claim of the appellee that the sale was accomplished by means of fraud or misrepresentation or non disclosure with regard to material facts, the verdict by the jury in favor of appellee in the sum of $5,600.00; the appeal from this judgment to this Court, the conflicting testimony of the parties with reference to land slides and other damage to the premises while the appellant lived in the said premises and with reference to other matters, the undisputed testimony of the appellee with reference to the hill slides and the other factors which caused damage to the said premises.

It has been apparent from the phraseology of this opinion that this Court does not hold that the appellant has been guilty of fraud, or deception, or that he has failed to speak when such speaking is required under the law by the circumstances of the case. Whether a higher standard of morality demanded a further disclosure is a matter that this Court is not called upon to decide.

The judgment of the Court of Common Pleas is therefore reversed, and final judgment is rendered in this Court in favor of appellant.

MATTHEWS, P. J., and LONG, J., concur.