DECISION
{¶ 1} Relator, Russell Campbell, filed this original action requesting a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order terminating relator's permanent total disability ("PTD") compensation, declaring an overpayment, and finding fraud.
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate of this court, who issued a decision including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate's decision recommended that this court deny the requested writ of mandamus.
 {¶ 3} Relator has filed an objection to the magistrate's decision asserting that the magistrate erred in concluding that the record contains evidence to support the commission's conclusion that relator was capable of engaging in activities inconsistent with the receipt of PTD compensation as of March 22, 1995. Relator's objection simply reargues an issue which was fully considered and addressed in the magistrate's decision and is overruled for the reasons set forth therein.
 {¶ 4} Having examined the decision of the magistrate and independently reviewed the file, pursuant to Civ.R. 53, we find that the magistrate properly determined the pertinent facts and applied the salient law thereto. We therefore adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, the requested writ of mandamus is denied.
Objection overruled; writ denied.
BROWN and WATSON, JJ., concur.
 DECISION IN MANDAMUS {¶ 5} In this original action in mandamus, relator, Russell Campbell, asks the court to issue a writ compelling respondent Industrial Commission of Ohio ("commission") to vacate its order terminating compensation for permanent total disability ("PTD"), declaring an overpayment, and finding fraud.
 {¶ 6} Findings of Fact:
 {¶ 7} 1. In May 1990, the commission awarded PTD compensation to Russell Campbell ("claimant").
 {¶ 8} 2. The Ohio Bureau of Workers' Compensation ("BWC") states that it sent PTD questionnaires to claimant's postal box, inquiring whether he was working, but claimant failed to respond.
 {¶ 9} 3. Accordingly, on March 31, 2000, the special investigations unit of the BWC opened an investigation file. Agents obtained a street address for claimant and visited, reporting that they observed what appeared to be an automotive repair shop.
 {¶ 10} 4. In June 2000, agents conducted surveillance for several days, observing claimant engaged in various activities at the shop. However, the agents could not clearly observe inside the garage. They met with the deputy chief of police, who said he would seek permission to use an adjacent property for surveillance. The deputy chief noted that he had known claimant since 1991, and he stated that claimant had been working at the shop for most of the time since 1991, if not all.
 {¶ 11} 5. In June 2000, the agents obtained videotape of claimant working on the front end of a minivan at the shop. They did a search for wage reports and obtained a copy of claimant's driver's license photograph.
 {¶ 12} 6. On September 22, 2000, agents observed claimant arriving at the shop at 8:26 a.m. He left at 9:04 a.m. and returned with a car part. Claimant was later observed putting a tire in his truck, and he was followed to a tire store. Claimant returned to the shop, worked briefly on a car outside, and then went into the shop.
 {¶ 13} 7. In December 2000, the BWC sent a questionnaire inquiring whether claimant was working full time or part time, and he answered that he was not working.
 {¶ 14} 8. In January 2001, an agent gathered documentary evidence and, in March 2001, more surveillance was conducted. In April 2001, an agent obtained the names of the shop's visitors and customers from their vehicle license plates.
 {¶ 15} 9. On May 2, 2001, agents saw claimant working under the dashboard of a truck but ended surveillance when claimant approached their vehicle and walked around it. On May 23, 2001, agents saw claimant working on several different vehicles.
 {¶ 16} 10. In June 2001, surveillance was conducted once and, in July 2001, an agent attempted to follow claimant by car but lost him.
 {¶ 17} 11. In September 2001, claimant was observed traveling to a residence and looking under the hood of a car there, and he was also observed working on two vehicles at the shop.
 {¶ 18} 12. In October 2001, agents did a drive-by observation and saw claimant working on a car that was jacked up. A subsequent drive-by revealed claimant operating a saw, cutting wood on the tailgate of his truck.
 {¶ 19} 13. Agents served a subpoena on claimant's bank and spoke with employees. They continued their attempts to contact the owner of the property, and learned that claimant had entered a 1995 contract to buy the property.
 {¶ 20} 14. On October 11, 2001, agents interviewed claimant at the shop. Claimant said he did not "really" work and did not do "much" work. Claimant's wife arrived with vehicle parts that her husband had asked her to pick up, and she said she did not know who was doing the actual labor and that her husband had several boys there to do the work. One of the workers was interviewed, and he stated among other things that claimant worked at the shop almost every weekday and frequently worked on cars. A witness stated that claimant's business was known as "Rusty's Garage" and that claimant did "all kinds of work" on cars except body work, and also did welding work.
 {¶ 21} 15. Agents received the subpoenaed bank records and reviewed them. In November 2001, agents interviewed managers of other repair shops in the area, who were familiar with "Russ's shop" and the type of business it did.
 {¶ 22} 16. In November 2001, agents obtained documents from several automotive-parts suppliers revealing thousands of dollars worth of parts purchased on claimant's accounts as early as 1997. Further, agents interviewed sales clerks who identified claimant as a purchaser from his picture. Witnesses noted that some of his purchases were not documented because he paid cash or because no warranty was involved.
 {¶ 23} 17. In December 2001 and January 2002, agents interviewed the shop's customers. Several stated that claimant had diagnosed their vehicle's problem and made the repairs on it, while others said that they did not know who at the shop actually fixed their vehicles. Customers said they paid cash, although one customer said he paid claimant more than $700 by check to install a snow plow on his truck.
 {¶ 24} 18. An agent spoke with another worker at the shop, who stated that, if the agent caused claimant to close the garage, it would take food away from the worker and his child, and the worker would "come after" the agent.
 {¶ 25} 19. In January 2002, an interview was held with the property sellers. The agents copied documents from the claim, including a PTD application on which claimant acknowledged that, if his disability improved and he could engage in gainful employment after receiving PTD, he must immediately notify the BWC.
 {¶ 26} 20. The investigative report was completed on January 30, 2002. On February 12, 2002, the BWC filed a motion asking the commission to terminate compensation, to find that claimant was not entitled to compensation after March 22, 1995, to find fraud, and to declare an overpayment.
 {¶ 27} 21. In March 2002, a hearing was held before a staff hearing officer who issued a lengthy order terminating PTD benefits and finding fraud, in pertinent part:
 {¶ 28} "The [BWC] Special Investigations Unit opened an investigation in regard to the claimant, Russell Campbell, on March 31, 2000, as the claimant had failed to return several [PTD] questionnaires that had been sent to him by the Claims Service Specialist. Two special agents were assigned to ask Mr. Campbell why he had not returned the questionnaires which are routinely sent to [PTD] Compensation recipients annually to determine whether or not they had returned to full-time, part-time, or volunteer work. When the agents arrived at the listed address, they observed what appeared to be an automotive repair shop operating at that location. The claimant's registered vehicle was parked in front of the business.
 {¶ 29} "On June 12, 2000, Special Agent Matthews met with Rich Herrig, Deputy Chief of the Village of Wayne Police Department. Deputy Chief Herrig stated that he had been of Wayne Police Department for nine years and that Mr. Campbell had been working at the auto repair business located in the building at 139 North Street, Wayne, Ohio, for most, if not all, of the past nine years. Deputy Chief Herrig further stated that he thinks Russ Campbell operates the business through word of mouth and that Mr. Campbell had been cited on several occasions for having junk cars parked on the property.
 {¶ 30} "The special agents * * * then set up an undercover video surveillance of the car repair business located at 139 North Street, Wayne, Ohio, and generally known throughout the community as `Rusty's Shop'. As a result of their video surveillance, they produced an edited video * * * which shows the claimant, Russell Campbell, performing work duties on numerous cars and trucks over the period from June 16, 2000 through October 11, 2001. On the last date of surveillance of October 11, 2001, four special agents * * * then entered the repair shop, operated by the claimant, Russell Campbell, and located on North Street in Wayne, Ohio. Upon entering the business, Agent Matthews, observed Campbell standing next to the engine compartment of a white Cadillac parked in the service bay. Campbell's hands, arms, face, and clothing were covered with grease. Agent Matthews then stated that he was there to talk to Mr. Campbell about working and collecting [PTD] Benefits. Mr. Campbell initially answered `Yeah'. Agent Matthews then clarified the statement and asked Mr. Campbell if he was stating that he was working while receiving [PTD] Benefits. Mr. Campbell again stated `yes', but subsequently recanted his statement and stated that he was not working; that he was just holding a part for someone else who was working on the Cadillac. Three special agents then walked over and interviewed another person, Andy Stevenson, who was on the premises on October 11, 2001. Andy Stevenson stated that Russell Campbell works at the car repair business known as Rusty's Shop, Monday through Friday. Mr. Stevenson further stated that Russell Campbell arrives at approximately 11:00 am and works to approximately 5:00 to 5:30 pm every weekday. Mr. Stevenson further stated that Russell Campbell `works on cars all the time.'
 {¶ 31} "Two special agents * * * then returned to Russell Campbell and advised him of what Andy Stevenson had stated. Mr. Campbell acted surprised and then admitted to doing some work around the shop, but denied doing as much work as the special agents alleged they had observed. These interviews were recorded on concealed audio and video tape * * *.
 {¶ 32} "Other persuasive evidence * * * included a `customer history' submitted by Advanced Auto Parts for Russell Campbell's account from June 27, 1998 forward. This printout revealed that Russell Campbell had purchased over $17,000 in automotive parts during that 3 1/2 year period and that the parts were for dozens of different vehicles, which did not match the types of vehicles owned or registered in the name of Russell Campbell.
 {¶ 33} "The [BWC] also submitted evidence of purchases made by Russell Campbell at Autozone. Autozone did not keep track of all purchases made by Russell Campbell, but only those covered by a warranty. These purchases dated back to February 11, 1997 and, again, included dozens of different types of motor vehicles.
 {¶ 34} "The [BWC] also submitted persuasive evidence which indicated that the claimant, Russell Campbell, also made major purchases of numerous automobile and truck parts at the Auto Value Auto Parts store in Bowling Green, Ohio and the NAPA Auto Parts Store in Bowling Green, Ohio.
 {¶ 35} "On December 19, 2001, two special agents went to the residence of Diana Owens * * * [who] stated that her ex-husband, Fabian Owens, works at Russell Campbell's business. The special agents then attempted to interview Fabian Owens. However, Fabian became angry and told the special agents that if they caused Campbell to close his shop that Fabian would come after the agents because they would be taking food off of his plate and off of his 5 year old child's plate. Fabian Owens acknowledged that he worked at Russell Campbell's automotive repair shop and that he worked '150 hours a week'.
 {¶ 36} "The [BWC] also submitted a statement from Jeffrey Galbraith, who had Mr. Russell install a snow plow on his dump truck. He further stated that he personally paid Mr. Campbell the sum of $700-$750 to install the snow plow and that he had paid Mr. Campbell by check.
 {¶ 37} "Based upon the surveillance video * * * as well as the Report Of Investigation and other evidence presented at hearing on March 21, 2001, it is the finding of this Staff Hearing Officer that said evidence has destroyed the foundation of the Industrial Commission order which awarded [PTD] Compensation to the claimant. That evidence contradicts the contention that the claimant is unable to perform sustained remunerative employment due to the residuals of the allowed conditions[.] * * *
 {¶ 38} "* * * [C]laimant's capability of performing sustained remunerative employment, as demonstrated by the surveillance video and other evidence in file, also constitutes grounds for the Industrial Commission to exercise continuing jurisdiction and terminate [PTD] Compensation.
 {¶ 39} "It is noted, for the record, that the claimant personally testified at hearing and he did not state that he was not physically or mental capable of performing the type of automotive repair work alleged by the [BWC] in their Report Of Investigation. The claimant alleged that he was merely `trying to stay active' and `trying to relieve stress' (transcript page 39). Furthermore, the claimant's counsel admitted that the [BWC] demonstrated `some activity, perhaps consistent with working on very few days.' However, they argued that the [BWC] does not have any evidence that the claimant was working prior to June 16, 2000. As noted previously, the evidence submitted by the [BWC] indicates that claimant purchased over $17,000 of motor vehicle parts from Advanced Auto Parts commencing June 27, 1998. These parts were for dozens of different vehicles and the claimant's allegation that it was parts for his vehicles and his friend's vehicles is not only found to be unpersuasive, but furthermore, found to be ludicrous. Likewise, the [BWC] submitted evidence that the claimant had purchased large quantities of auto parts from Autozone, for dozens of different vehicles, commencing February 11, 1997. Furthermore, the Deputy Chief of Police for the Village of Wayne stated that he has been with the Wayne Police Department for nine years and that Russell Campbell had been working in the automotive repair business known as Rusty's Shop, most, if not all of the past nine years.
 {¶ 40} "The [BWC], furthermore, submitted persuasive evidence indicating that the claimant, Russell Campbell, entered into an Assignment of a Land Installment Contract, dated March 22, 1995 and recorded with the Wood County Recorder on April 20, 1995, purchasing the automotive repair shop located at 139 North Street, Wayne, Ohio. Therefore, it is the finding of this Staff Hearing Officer that the claimant, Russell Campbell, has been engaged in the physical work activity of operating an automotive and truck repair business, known as Rusty's Shop, * * * since March 22, 1995, while simultaneously collecting [PTD] Compensation and [DWRF] Benefits * * *.
 {¶ 41} "* * * [PTD] Compensation is hereby TERMINATED, effective March 22, 1995.
 {¶ 42} "* * * [A]n OVERPAYMENT is hereby declared in regard to [PTD] Com-pensation and [DWRF] Benefits previously paid from March 22, 1995 forward * * *.
 {¶ 43} "* * *
 {¶ 44} "This order is based particularly upon the video surveillance tape presented at hearing and contained in the file, as well as the Report Of Investigation * * * filed February 12, 2002.
 {¶ 45} "* * * [C]laimant, Russell Campbell, endorsed and negotiated warrants from the [BWC] for payment of [PTD] Compensation that contained a restrictive endorsement and warning. The warning specifically stated that `If this check is to compensate you for total disability, you are not entitled to it, if you are working.' It is the further finding of this Staff Hearing Officer that the claimant, Russell Campbell, knowingly completed a [PTD] questionnaire, dated December 30, 2000 and did not disclose his work activities at the automotive repair business known as Rusty's Shop.
 {¶ 46} "* * *
 {¶ 47} "* * * [C]laimant, Russell Campbell, had the duty to disclose to the [BWC] that he had returned to sustained remunerative employment at the time that he purchased the automotive repair business, known as Rusty's Shop, on March 22, 1995. However, the claimant concealed the fact that he was operating his own automotive repair business. Russell Campbell's concealment of his work activity was material to the transaction at hand, as the [BWC] would not have paid [PTD] Compensation had he truthfully revealed the fact that he had been involved in sustained remunerative activity as the self-employed owner/operator of an automotive repair business. Russell Campbell made false statements to the [BWC], with the knowledge of their falsity, when he completed the [PTD] questionnaire letter on December 30, 2000 and, more importantly, when he endorsed and cashed over 300 warrants from the [BWC] that included warning language above his signature indicating that it was illegal to cash the warrants if he was working. Furthermore, * * * Russell Campbell directly lied to the [BWC] Special Agents when they interviewed him on October 11, 2001. Furthermore, Russell Campbell made the false statements with the intent of misleading the [BWC] into relying upon those statements, so that he could continue to receive [PTD] Compensation. The [BWC] justifiably relied upon the false statements and misrepresentations made by Russell Campbell, because he had concealed his activity from the [BWC]. Therefore, there was a resulting injury proximately caused to the [BWC] Trust Fund when [PTD] Compensation was paid out of said fund to Russell Campbell, over the period of March 22, 1995 through the present, since he was not entitled to receive the aforesaid compensation.
 {¶ 48} "Therefore, it is the finding of this Staff Hearing Officer that all of the elements of civil fraud have been met, based on the facts of this case." (Emphasis sic.)
 {¶ 49} 22. In regard to recoupment, the commission's order states:
 {¶ 50} "* * * [C]laimant committed fraud against the [BWC] by cashing warrants for [PTD] Compensation from March 22, 1995 through the present, while engaged in sustained remunerative work activity at his automotive repair shop. Therefore, * * * the [BWC] is not limited to collecting the aforesaid overpayment from future awards of compensation. Quite the contrary, it is the order of this Staff Hearing Officer that the [BWC] may utilize any and all lawful means to collect the overpayment of compensation made to the claimant, Russell Campbell, as he was not entitled to [PTD] Compensation from March 22, 1995 through the present, due to fraud * * *." (Emphasis sic.)
 {¶ 51} Conclusions of Law:
 {¶ 52} In this original action, claimant contends that the commission abused its discretion in finding fraud and declaring an overpayment. Specifically, claimant argues that: (1) the commission cited no evidence to support its finding that claimant was engaged in work activity incompatible with PTD as of March 22, 1995; (2) the commission cited no evidence as to one of the elements of fraud; and (3) that the BWC failed to file its motion to terminate PTD within a reasonable time of discovering the alleged fraud.
 {¶ 53} Several established principles apply to the court's consideration of claimant's request for a writ of mandamus. First, after the commission has awarded PTD compensation, it has authority to terminate compensation when the claimant (1) has engaged in activities inconsistent with permanent total disability, (2) has engaged in sustained remunerative employment, or (3) is capable of engaging in some form of sustained remunerative employment. State ex rel. Smothers v. Mihm (1994), 69 Ohio St.3d 566; State ex rel. Frazier v. Conrad (2000),89 Ohio St.3d 166; State ex rel. Schultz v. Indus. Comm. (Nov. 28, 2000), Franklin App. No. 00AP-166 (upholding termination of compensation based on activities inconsistent with PTD where there was evidence of part-time work activities but no evidence of pay); State ex rel. Holt v. Indus. Comm. (Oct. 26, 2000), Franklin App. No. 00AP-1 (upholding termination of PTD where there was evidence of recreational/sports activities inconsistent with PTD but no evidence of work activity nor any evidence of paid employment). According to these precedents, the commission is not required to find that the claimant was engaged in gainful employment or any employment at all. Rather, the claimant is ineligible to receive PTD while engaging in activities inconsistent with PTD.
 {¶ 54} Further, the concept of "working" or "employment" is not limited to manual labor. A person who supervises others and arranges for supplies may nonetheless be engaged in work activity. This court has rejected the argument that a person is not engaged in work when the activities are managerial and do not involve strenuous physical labor. E.g., State ex rel. Nahod v. Indus. Comm. (Sept. 2, 1999), Franklin App. No. 98AP-1157 (finding that claimant was not simply the business owner but managed and operated it); State ex rel. Kasler v. Indus. Comm. (Feb. 15, 1996), Franklin App. No. 95AP-341 (noting that work need not include physical labor in order to preclude eligibility for disability compensation).
 {¶ 55} However, a person receiving disability compensation may have personal investments and give reasonable attention to them. See, generally, State ex rel. Ford Motor Co. v. Indus. Comm., 98 Ohio St.3d 20,2002-Ohio-7038 (clarifying that mere ownership of a business is not incompatible per se with receiving disability compensation). Nevertheless, some entrepreneurial activities and some investment activities may be sufficiently extensive to be deemed employment. Where a person is actively involved in operating a business, the commission may conclude that his or her activities are inconsistent with receipt of total disability compensation. Involvement such as making sales or assisting in day-to-day operations of a shop may be viewed as employment incompatible with disability, as opposed to mere ownership or managing one's personal finances. See, generally, Nahod; Schultz, supra; State ex rel. Rousher v. Indus. Comm. (Feb. 3, 2000), Franklin App. No. 99AP-286.
 {¶ 56} The courts have recognized, however, that there are circumstances where some degree of managerial activity is compatible with receiving total disability compensation. Where the allowed conditions prevent an injured worker from continuing his former participation in a business he operated prior to his injury, and where the injury has forced claimant to withdraw from his former business activities except those necessary to preserve the business until he is physically able to return to it, the commission has discretion to conclude that the activities were compatible with receipt of total disability compensation where the claimant's activities were minimal and only indirectly generated income. Ford, supra. See, also, State ex rel. Am. Std., Inc. v Boehler, Franklin App. No. 01AP-1138, 2002-Ohio-3323 (involving a worker who owned rental properties but could no longer perform the necessary repairs/remodeling after the injury, hiring workers to perform it and supervising them).
 {¶ 57} Further, the magistrate acknowledges that the activities of a disabled worker may be a therapeutic activity or hobby that is compatible with PTD. However, the commission as the finder of fact has discretion to evaluate the evidence and determine its credibility and weight. See Holt; Rousher, supra; State ex rel. Gyarmati v. George E. Fern Co., Franklin App. No. 01AP-1357, 2002-Ohio-4323.
 {¶ 58} In the present action, the commission found that claimant was capable of performing sustained remunerative employment. It also found that claimant was actually running a business. Either of these findings would support a denial of PTD benefits, and the magistrate concludes that the commission was within its discretion to decide that claimant was not entitled to PTD and DWRF benefits that he received. The commission cited reliable, probative and substantial evidence in support of its decision to terminate these benefits, and it provided a reasonable explanation of its rationale.
 {¶ 59} The commission cited evidence from customers, suppliers, investigators, and employees to support its conclusion that claimant was running a repair shop. The record includes evidence that claimant engaged in activities including: examining and assessing vehicles for potential repair work; buying substantial amounts of parts and supplies from multiple vendors; providing the property and buildings for the automotive repair business; doing manual work in maintaining the shop buildings; doing manual work on some of the vehicles; arranging for workers to perform some of the labor; paying the workers or otherwise compensating them; and receipt of payments from customers. There was evidence from several witnesses that people in the community knew the business as "Rusty's shop" or "Russ's shop" and stated that claimant ran the business. The commission cited abundant evidence to support its finding that claimant was engaging in activities inconsistent with his receipt of PTD compensation.
 {¶ 60} However, claimant challenges the finding of fraud. Claimant focuses on one of the requisite elements: that the claimant made false representations on which the BWC relied. To the extent there were false statements, claimant emphasizes that there was no evidence of an affirmative misrepresentation until he responded to the questionnaire dated December 30, 2000. Second, claimant argues that, to the extent that he lied on the questionnaire or during the October 2001 interview, the commission could not have reasonably relied on those false statements.
 {¶ 61} As to the first argument, the magistrate notes that it is well settled that a person's silence, where there is a duty to disclose, constitutes a misrepresentation that can support a finding of fraud. See, generally, Schubert v. Neyer (1959), 165 N.E.2d 226, 229; State v. Warner (1990), 55 Ohio St.3d 31, 53. Here, the commission made an explicit finding that claimant had a duty to disclose his work activities to the BWC. Based on the signed acknowledgement in the PTD application, the commission found that claimant had a duty to inform the BWC when he began operating an automotive repair shop. The commission further found that the warning on the checks made claimant aware that he was not entitled to the compensation while working, and it found that claimant, by cashing the checks, essentially misrepresented that he was entitled to them. The commission was within its discretion to conclude that claimant had a duty to disclose and knew he had a duty to disclose, and accordingly made material misrepresentations through his silence and concealment, distinct from the affirmative misrepresentations recited in the order.
 {¶ 62} The second argument is that, during the investigation, the agents learned that claimant was working and, therefore, any subsequent payments by the BWC, after the agents made that discovery, could not have been based on reasonable reliance on his misrepresentations. Claimant argues that, by the time he sent back the December 2000 questionnaire, the BWC could not have reasonably relied on his representations because the BWC knew or should have known by that time that claimant was not entitled to further PTD compensation.
 {¶ 63} First, the commission did not rely solely on the written statement in the 2000 questionnaire. The evidence is substantial that, preceding the investigation, the BWC made PTD payments pursuant to the commission's award, having no reason to believe that claimant was ineligible for continued benefits. In other words, the PTD payments were based for many years on the BWC's reasonable reliance on claimant's silence and concealment. Thus, any lack of reliance on the statements in the 2000 questionnaire does not destroy the basis of the commission's finding of fraud.
 {¶ 64} Second, even if we accept that the investigators knew by December 2000 that claimant was working, the magistrate finds no defect in the commission's finding of fraud. In other words, the magistrate is willing to accept that, when the investigators saw claimant's response to the December 2000 questionnaire, they probably questioned its truth. However, their investigation was incomplete at that time, and, while the investigation continued, the BWC had a legal obligation to continue paying PTD regardless of its agents' growing file in the investigation. The BWC had no power to terminate PTD benefits until ordered by the commission, following an evidentiary hearing. Further, during its investigation into claimant's activities, the BWC, as a possible victim of fraud, had a legitimate interest in pursuing its investigation until it had solid evidence one way or the other. The BWC had a legitimate interest in continuing the investigation covertly without informing the potential fraud-feasor of its suspicions and/or beliefs.
 {¶ 65} Although claimant is correct that, during the summer and fall of 2000, the investigators observed him doing work activities, claimant has not established that the BWC had a legal duty to file a motion to terminate PTD at that point. At that time, it would have been debatable as to whether the BWC had sufficient evidence to support a termination of PTD, let alone a finding of fraud. While the proofs for terminating compensation are not as great as the proofs for showing fraud, a motion to terminate PTD can nonetheless require repeated observations over time in order to establish the nature of the claimant's activities over a sufficient period. For example, a videotape of a man doing a car repair on one or two afternoons may very well be insufficient to terminate PTD because the mere fact that a person can do a physical task for an hour or so, on an occasional basis, does not necessarily mean that his activities are inconsistent with PTD or that he is capable of sustained remunerative employment. Thus, BWC investigators may reasonably conclude that they need to document a person's activities over a long period of time before they can determine whether there is sufficient evidence to terminate compensation.
 {¶ 66} To support a finding of fraud, however, the type and quantum of proof are much greater. To cease paying compensation, the commission need only find that the person is engaged in activities inconsistent with PTD; it need not find a knowing misrepresentation. To declare fraud, however, the commission must not only find a lack of eligibility for PTD but must also find each of the elements of fraud. Thus, even after investigators believe that the person is working or capable of working, they may not be convinced there is fraud or that they have enough evidence to prove it. Thus, while it may appear evident at some point in an investigation that the claimant is engaging in work activities, it can take further investigation of many months to determine whether there is fraud.
 {¶ 67} Here, by the end of 2000, investigators had gathered enough evidence to justify further investigation. Whether they had sufficient evidence to seek a termination of PTD or a declaration of fraud is debatable. Nonetheless, the magistrate agrees that, at some point after the investigation began, the BWC had reason to suspect that claimant was not entitled to the PTD payments he was receiving. The BWC continued to make payments, not because it still relied on claimant's representations but because it was still under the commission's order to pay and also because, during the initial phases of the investigation, the BWC could not be sure whether claimant's representations were reliable or not. The magistrate accepts that, subsequently, as the investigation progressed, the BWC did not continue paying PTD due to any reliance on claimant's representations but due solely to its legal duty to continue making the payments until ordered otherwise by the commission.
 {¶ 68} In sum, the magistrate acknowledges that the investigators stopped believing claimant's representations months before the BWC stopped sending his payments. That fact, however, even if true, does not destroy the finding of fraud. At most, these facts indicate that the earlier payments were a direct result of claimant's contemporaneous fraudulent conduct whereas the later payments — made after fraud was suspected — were a direct result of claimant's earlier fraudulent conduct. This distinction appears to have no legal effect, however, because it was claimant's fraudulent conduct in any event that caused all the payments to which he was not entitled.
 {¶ 69} Next, claimant takes issue with the timeliness of the BWC's actions in seeking to terminate PTD and find fraud. Claimant appears to argue that the BWC should have commenced its investigation sooner or should have completed its investigation sooner.
 {¶ 70} The BWC reported that it initiated the investigation after claimant did not respond to questionnaires about whether he was working. This is not a case where the investigation was prompted by a complaint or an anonymous tip. Further, this is not a case where the claimant's file plainly included a statement of earnings and thus presented a direct indication of a problem with the receipt of disability compensation. Rather, in the present case, the investigation was prompted by an absence of documents — a lack of responses to form letters. Under these circumstances, with no overt indication of a definite problem, the magistrate finds no duty to initiate an investigation within any particular amount of time.
 {¶ 71} Claimant also appears to argue that the BWC should have filed its motion much earlier. Claimant suggests that the commission should have filed the motion as soon as it obtained videotape of claimant performing the activities in June 2000. However, the magistrate sees no requirement that the BWC must file the motion before it has completed the investigation. As discussed above, a single episode of physical activity, or even several, may not be sufficient to support a termination of PTD. The BWC cannot reasonably be required to file its motion promptly upon gathering its earliest probative evidence — a procedure that would tend to destroy the likelihood of obtaining any further evidence.
 {¶ 72} Further, claimant refers to the BWC's "discovery of fraud" in June 2000, but the court need not conclude that a discovery of fraud took place in June 2000. The detection of a PTD awardee engaged in some physical activities is not necessarily a discovery of fraud. As noted above, the type and amount of evidence needed to support a declaration of fraud is much greater than the evidence needed to make a finding of fact that the person is capable of working. Although the BWC investigators may have suspected fraud during the summer and fall of 2000, one cannot say as a matter of law that they made a clear "discovery" of fraud at that time. In sum, the BWC is within its reasonable discretion to continue an investigation and refrain from filing a motion until it has developed a solid case founded on substantial, reliable, and probative evidence. The magistrate sees no basis in law for the court to impose a deadline for the BWC to complete its fraud investigations.
 {¶ 73} Here, the surveillance began in June 2000 and ended in October 2001, which does not appear excessive under the circumstances. The magistrate acknowledges that the investigation appeared to be fairly sporadic for the first 12 months. However, in September and October 2001, the investigators obtained particularly useful evidence during surveillance, and the investigation then progressed rapidly. In October 2001, investigators confronted the claimant openly with their observations, and the agents were then able to conduct open interviews with numerous employees, customers, bank tellers, parts suppliers, and prior property owners. The investigative report was completed in January 2002, and the motion was filed on February 12, 2002. The magistrate concludes that claimant has not proven in mandamus that the commission had a duty to deny the BWC's motion because the motion was unduly delayed.
 {¶ 74} In the present action, unlike the situation in State ex rel. Smith v. Indus. Comm., 98 Ohio St.3d 16, 2002-Ohio-7035, the record does not demonstrate that the BWC had definite, specific evidence of wage-earning in its files for many years, which it ignored. Here, the BWC did not resurrect old documents that had lain in the file for many years, commencing a plainly tardy investigation. Moreover, the magistrate notes that the administrative record does not reflect that claimant asked the commission to deny the BWC's motion on the grounds that the motion to terminate PTD was not filed in a reasonably timely manner nor on the grounds that the BWC failed to commence its investigation in a reasonably timely manner after being given a clear report of wage-earning. The magistrate concludes that the commission did not have a clear duty of law to deny the BWC's motion on the grounds of a tardy pursuit of the alleged fraud.
 {¶ 75} Claimant's third contention is that the evidence does not establish that he engaged in activities inconsistent with PTD prior to June 2000, when investigators observed him working on a vehicle at his shop. In the alternative, claimant argues that the earliest that the commission could find activities inconsistent with PTD was in 1997, based on evidence of substantial purchases of auto parts. In sum, claimant argues that there is no evidence to support the finding that claimant was engaged in activities inconsistent with PTD as of March 22, 1995, when he entered the contract to buy the property on which the shop was located.
 {¶ 76} To support its finding that claimant was capable of engaging in work activities as of March 1995, the commission relied particularly on several items of evidence: (1) testimony from the deputy chief of police, who stated that claimant had been working at the garage since the officer joined the department in 1991 and that claimant had worked there for most if not all of the past nine years; (2) documentary evidence that claimant purchased the property on March 22, 1995; and (3) the marked absence of any testimony from claimant that he was physically incapable of performing repair work as of that time.
 {¶ 77} None of these items of evidence is, of course, conclusive. Indeed, to the magistrate, none of them appears very persuasive by itself. However, these items of evidence, considered together, are sufficient to support the commission's finding that claimant was capable of gainful employment, or was engaging in activities inconsistent with PTD, as of March 22, 1995. The deputy's statements are probative that claimant had been doing car repairs in the area since 1991 even if did he did not operate a business steadily from 1991 to 2000. The real estate records show a 1995 purchase of the property on which a shop was well established within a few years. The documents show extensive purchases of auto parts by claimant in 1997 and thereafter, suggesting a thriving business. The lack of earlier supply records does not conclusively prove that claimant had no business activities in the prior years, given the potential for cash purchases, purchases from other vendors, and lack of retaining older account histories. Moreover, the issue before the commission was not solely whether claimant was actually repairing cars as of March 1995 but whether he was capable of it.
 {¶ 78} If the commission had found that claimant was engaged in repair activities dating back to 1991, the evidentiary foundation would have been shaky. But the officer's statements — coupled with the evidence of purchasing a garage/shop in 1995, followed by extensive purchases of auto parts from several vendors, and the lack of evidence of any change in functional capacity between 1995 and 2000 permitting claimant to start repairing cars — provided an adequate basis for finding that claimant was capable of running his business as of March 1995. Although the evidence was susceptible to interpretation, it was sufficient for the finder of fact to consider whether the claimant was capable of running his business as of March 1995.
 {¶ 79} For the foregoing reasons, the magistrate concludes that claimant has not proven an abuse of discretion in mandamus and recommends that the court deny the requested writ.